DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Defendant Torrance Vaughan has appealed from his bribery conviction in the Lorain County Common Pleas Court. He has argued that: (1) the trial court incorrectly allowed the State to amend the indictment pursuant to Rule 7(D) of the Ohio Rules of Criminal Procedure; (2) his conviction was against the manifest weight of the evidence; (3) the trial court incorrectly sentenced him under the law as it existed prior to July 1, 1996, before the enactment of the new sentencing guidelines in Senate Bill 2; and (4) he was denied his constitutional right to effective assistance of counsel. This Court affirms the judgment of the trial court because: (1) the amendment to the indictment did not change the identity of the crime charged; (2) the conviction was not against the manifest weight of the evidence; (3) the trial court did not apply the incorrect sentencing guidelines in sentencing defendant; and (4) defendant has not shown that he was denied the effective assistance of counsel.
 I.
Defendant was indicted on February 22, 1995, on one count of bribery, a violation of Section 2921.02(C) of the Ohio Revised Code, with a specification for a prior offense of violence pursuant to Section 2941.143 of the Ohio Revised Code. He and another individual were alleged to have offered money to two witnesses to change their testimony in a case in which defendant and the other individual were being tried on other charges. After being told by one of the witnesses that a bribery scheme was afoot, the police placed wires on the two witnesses and taped several conversations that occurred at the courthouse during the second day of trial among the witnesses, the other individual, and a man who acted as a go-between for defendant and the other individual and the witnesses. Police arrested the go-between and two members of the other individual's family as they were entering a vehicle parked near the courthouse, having heard over the wires that those family members would be bringing bribe money from the bank. The police found $1,500 cash in an envelope under the carpeting in the vehicle's trunk.
Defendant was tried to the court on the bribery charge beginning January 17, 1997. During the trial, the State moved to amend the prior specification from aggravated robbery to attempted carrying a concealed weapon. At the close of the trial, the trial court granted the motion, found defendant guilty as charged, and sentenced him to two to ten years' incarceration. He timely appealed to this Court.
 II. A.
Defendant's first assignment of error is that the trial court incorrectly allowed the State to amend the indictment pursuant to Rule 7(D) of the Ohio Rules of Criminal Procedure. He was indicted on one count of bribery with a specification for a prior offense of violence. According to defendant, the amendment changed the name or identity of the specification referred to in the indictment and, therefore, violated his right to due process. Rule 7(D) provides, in pertinent part:
 The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged.
Defendant was charged with the crime of bribery with a prior offense of violence specification. The specification itself was not a crime charged (it referred to a prior conviction), nor was it an element of the crime charged. Rather, it was merely a penalty enhancer to the crime charged. Defendant has failed to establish that a change in the name of the crime referred to in a specification is prohibited. It may be that changing the category of the specification itself is prohibited, for example, if a prior offense of violence specification is changed to a firearm specification. See State v. Winstead (Sept. 28, 1994), Hamilton App. No. C-940046, unreported, 1994 Ohio App. LEXIS 4314, *4-6. See, also, Sections 2941.141 through 2941.144 of the Ohio Revised Code (in effect during 1995, when defendant was indicted). In this case, however, the amendment to the specification substituted a new prior offense of violence, attempted carrying a concealed weapon, for the original prior offense of violence, aggravated robbery, both of which fall into the specification category established by Section 2941.143 of the Ohio Revised Code. This Court is not persuaded that such an amendment is prohibited by Rule 7(D) of the Ohio Revised Code or by any other law. See State v. Winstead, supra.
Defendant has cited State v. Dilley (1989), 47 Ohio St.3d 20, in support of his position. Dilley, however, does not control here. In Dilley, the original indictment did not contain a specification, and the amendment to the indictment to include a specification was held to be prejudicial error because the mandatory procedure found in Section 2941.143 of the Ohio Revised Code was not followed. In this case, the original indictment contained a specification, and the statutory procedure was followed:
 Imposition of an indefinite term pursuant to division (B)(6) or (7) of section 2929.11 of the Revised Code is precluded unless the indictment * * * specifies either that, during the commission of the offense, the offender caused physical harm to any person or made an actual threat of physical harm to any person with a deadly weapon, * * * or that the offender has previously been convicted of or pleaded guilty to an offense of violence. Such a specification shall be stated at the end of the body of the indictment * * *.
Section 2941.143 of the Ohio Revised Code. The indictment did specify that defendant had been previously convicted of an offense of violence. The amendment, therefore, followed the above procedure; did not change the name or identity of the crime charged;[1] and did not change the category of specification included in the indictment.[2] Finally, defendant has not even alleged, much less shown, that he was misled or suffered any prejudice as a result of the amendment. See State v. O'Brien
(1987), 30 Ohio St.3d 122, 126. Defendant's first assignment of error is overruled.
 B.
Defendant's second assignment of error is that his conviction was against the manifest weight of the evidence. To determine whether a conviction is against the manifest weight of the evidence:
 [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Otten (1986), 33 Ohio App.3d 339, 340.
Defendant was convicted of bribery pursuant to Section2921.02(C) of the Ohio Revised Code, which provides:
 No person, with purpose to corrupt a witness or improperly to influence him with respect to his testimony in an official proceeding, either before or after he is subpoenaed or sworn, shall promise, offer, or give him or another person any valuable thing or valuable benefit.
He has argued that "there was no evidence presented to the [trial] court that [he] was directly involved in any bribery attempts," and "no testimony was produced at trial that indicated that [he] was either directly or indirectly involved in the attempt to bribe [the witness]." For example, according to defendant, he was "not on any of the taped conversations regarding the bribery attempts"; there was no evidence that he had any "connection to the vehicle where the others were arrested and the cash was found"; the other individual involved testified that he (the other individual) "never entered into a conspiracy with [defendant]"; and defendant did not initiate any of the conversations in evidence that involved him.
Regardless of the absence of these particular kinds of evidence, there was other evidence of defendant's direct and indirect involvement in the bribery scheme. Allen Smith, the man who served as a go-between for defendant and the other individual and the witnesses, testified that he was directed by defendant to ask what it would take for the witnesses, Brian Baker and Jay Bonds, to change their testimony:
 Q. Let's get back to the matter at hand. At the Red Fox Lounge there was talk about changing testimony, correct?
A. Correct.
 Q. And that was directed to you through and by this defendant, correct?
A. Yes.
 Q. And you were asked or involved in going to see Brian and talking to Brian about what it would take to change his testimony, correct?
A. Correct.
Q. And there was money talked about, was there not?
 A. I mean, there was no set amount, but there was — Q. Right, what is it going to take?
A. Yeah.
* * *
 Q. And was the subject of those conversations with Brian Baker, what's it going to take to change your testimony?
A. Yes.
* * *
 Q. Now, there also came a time, was there not, when you were talking to Jay Bonds and the discussion was, change your story, then they will pay you? You stated that, didn't you?
A. Yes.
* * *
 Q. And you have heard the tape recording of Brian Baker and yourself talking, correct?
A. Yes, I have.
 Q. And there's no doubt about it that Brian Baker and Jay Bonds were spoken to by you on behalf of the defendant, Torrance [Vaughan], correct?
A. Correct.
 Q. And you were to communicate to them, don't show up, drop the charges or change your testimony, correct?
A. Correct.
 Q. In return for that there would be money and there would also be a vehicle fixed, do you agree with that?
 A. The money is correct, but as far as the fixing was concerned, it was something tossed, it wasn't a sure thing.
* * *
 Q. You made the statement to the police, do you recall, [defendant] also asked you to find out how much it was going to cost? [Defendant] asked you what is it going to cost. Go talk to Baker and talk to Bonds. What is it going to cost, right?
A. Yes.
 Q. And we need look no further than those tapes because that is exactly what you did, right?
A. Yes.
Jay Bonds testified as well:
 Q. Wasn't it you that said to send [defendant's girlfriend] to go get the money?
 A. When I suggested she go get the money, then [Allen Smith] said she was supposed to bring the money back.
Q. Where was that on the tape?
 A. I don't know. She was supposed to have [defendant's] half of the money.
Q. What half of the money?
 A. Half of his money, because he said he was going to pay [Brian Baker] half to change his testimony, Brian.
Q. Who was?
 A. [Defendant] was supposed to have paid half, [Brian Baker] half to change his testimony.
Q. Where did you get this information from?
A. The running man, what's his name, Allen.
Q. Allen?
A. Yeah.
* * *
 Q. And it was discussed on the tapes, if the Judge listens to them, it's represented that [defendant] was going to pay half and [the other individual] was going to pay some?
 A. Right, right, because [the other individual] couldn't pay both of us off * * *.
 Brian Baker also testified on direct examination as follows:
Q. Where did you first see [Allen Smith] and when?
A. He came over to my girlfriend's house.
* * *
 Q. Is that the first time you talked to him about that particular case?
A. Yeah, he sent him over there.
Q. Who sent him?
* * *
A. Torrance [Vaughan].
* * *
Q. How do you know [defendant] sent him over there?
 A. Because he said [defendant] said this is your last chance, if you don't take the $2,500 or whatever, or something, he going to have something done to my girl and my son.
* * *
 Q. What did you tell Allen on this day when he's coming over trying to get you to change your testimony?
A. My exact words?
Q. Yeah.
 A. I told Allen to tell [defendant] to kiss my ass, I would see him in court.
 Q. Did you ever want to drop the charges against this defendant for that incident?
A. No.
 Q. Did you ever approach him or have someone approach him and say, hey, if you pay me, I'll drop the charges, other than when you were wearing a wire at the police direction?
 A. After they jumped me the second time or any other time I never messed with them, I never went their way, I never even talked to him, they was always, you know, coming up to me, giving me deals.
* * *
 Q. At the time you came back and you were wired, did people approach you about changing your testimony?
A. Yeah.
 Q. Could you tell the Court specifically who did that?
 A. Allen came up to me, you know, talking about there was going to be some money to walk out of the Courtroom.
 Q. Did he say [defendant] was going to give you money, [the other individual] was going to give you money?
A. They both was going to give me money.
Q. What did you have to do, what was the money for?
A. To not testify, leave.
On cross-examination, Brian Baker testified further:
 Q. It would be clear to say that [the other individual] offered you money so you would not testify against him?
 A. When I talked to [the other individual] downstairs that day, he was not only talking about himself, he was talking about, asking me what do I want, but he was talking about him, Torrance [Vaughan] and him, he was asking me, tell him how much I wanted and they was going to get it, both of them was going to get it.
Q. How much?
 A. How much? At that time they was talking about $5,000 then.
Defendant's assertions, then, that evidence of defendant's direct or indirect involvement was not presented at trial, are contradicted by the record. Furthermore, even though there was testimony adduced at trial that contradicted the above statements, as defendant has pointed out, that does not mean that a decision consistent with the above statements is against the manifest weight of the evidence. Defendant has not suggested, much less shown, that certain parts of testimony or certain witnesses were clearly more credible than others or that the trial court incorrectly weighed reasonable inferences in light of the evidence. Based on a review of the record, this Court cannot conclude that the trial court, in resolving evidentiary conflicts, "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Defendant's second assignment of error is overruled.
 C.
Defendant's third assignment of error is that the trial court incorrectly sentenced him under the law as it existed prior to July 1, 1996, before the enactment of the new sentencing guidelines in Senate Bill 2. According to defendant, the new guidelines should be deemed retroactive, and he should have been given the benefit of the lesser penalty applicable to his offense prescribed by S.B. 2. First, he has argued that the Ohio Supreme Court, in State v. Morris (1978), 55 Ohio St.2d 101, and State v.Bradford (1978), 55 Ohio St.2d 116, imposed "a duty upon the lower courts to modify sentences accordingly where a law has been revised to reflect a lesser penalty." This argument is without merit. In Morris, supra, at syllabus, the Ohio Supreme Court, in addressing the constitutionality of Section 3 of Amended Substitute House Bill Number 300, effective November 21, 1975, held that "the General Assembly may require by statute that certain courts review past convictions and sentences rendered under repealed criminal laws * * * ". This is not, as defendant has suggested, a blanket command for courts to automatically modify sentences when laws change.
In Bradford, the Ohio Supreme Court again addressed Amended Substitute House Bill Number 300, this time interpreting certain language in that bill. Defendant's only specific reference toBradford in his brief is the Supreme Court's quote from the actual text of the bill. In State ex rel. Maynard v. Corrigan
(1998), 81 Ohio St.3d 332, 333, the Ohio Supreme Court determined that cases involving Amended Substitute House Bill Number 300 were not helpful to an argument similar to defendant's:
 Finally, the cases relied on by appellants are inapposite because they addressed Am.Sub.H.B. No. 300, effective November 21, 1975, an amendment that specified that persons convicted and sentenced under prior law were entitled to have their previously imposed sentences modified in conformity with the penalties provided by the new law. See State v. Morris (1978), 55 Ohio St.2d 101, * * *; State v. Bradford (1978), 55 Ohio St.2d 116, * * *. Am.Sub.S.B. No. 2, as amended by Am.Sub.S.B. No. 269, contains no similar provision.
It is not, therefore, as defendant has asserted, "clear, followingMorris and Bradford, that the [Ohio Supreme] Court imposes a duty upon the lower courts to modify sentences accordingly where a law has been revised to reflect a lesser penalty."
Second, defendant has argued that there was initially a "transitional provision" in Amended Substitute Senate Bill 2 that provided "for the Adult Parole Authority to reduce the sentences of existing prisoners" but that, because this would have given the Adult Parole Authority "a higher power than the local Courts of Common Pleas," the transitional provision was removed, leaving "issues of re-sentencing to the local Common Pleas Courts." It is defendant's position that, because it "cannot be denied that the legislative intent is to provide for uniform sentencing throughout the State, reduce the overcrowding of the State's penal institutions, and to establish fairness in sentencing throughout the State," the legislature must have intended that the "sentences of current inmates be reviewed and, where appropriate, reduced." Defendant has not cited in his brief any legal authority in support of these assertions. Such unsupported, conclusory assertions will not be accepted by this Court as a sufficient legal argument. See Rule 16(A)(7) of the Ohio Rules of Appellate Procedure.
Third, defendant has argued that the legislature's attempt, through Senate Bill 269, to limit the applicability of Section1.58(B) of the Ohio Revised Code by amending Section 5 of Amended Substitute S.B. 2 was really an attempt to amend Section 1.58(B) without following state constitutional requirements. The attempt, therefore, according to defendant, was ineffective, with the result that defendants sentenced after July 1, 1996, should be sentenced under the new S.B. 2 guidelines. This Court has previously considered this argument and rejected it. See, e.g.,State v. Lawrence (Oct. 29, 1997), Summit App. No. 18298, unreported, at 8-10; State v. Yurchiak (Jan. 7, 1998), Medina App. No. 2684-M, unreported; State v. Shelly (Feb. 18, 1998), Medina App. No. 2676-M, unreported, at 8-10. Defendant's third assignment of error is overruled.
 D.
Defendant's fourth assignment of error is that he was denied his constitutional right to effective assistance of counsel. An attorney's performance is ineffective only if it falls below an objective standard of reasonable representation and results in prejudice to the defendant. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. To show prejudice, the defendant must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id. at paragraph three of the syllabus.
Defendant has argued that his trial counsel failed to call certain witnesses that defendant wanted him to call and that he failed to move for acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure at the appropriate times at trial. Defendant, however, has not suggested, much less demonstrated, how these decisions prejudiced him. He has not indicated what the testimony of those uncalled witnesses would have been or how their testimony would have contributed to his defense, nor has he demonstrated that there were grounds for acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure. He has not established that the outcome of the trial probably would have been different but for his counsel's alleged errors. See Bradley,supra. Absent a showing of prejudice, defendant cannot be said to have been denied the effective assistance of counsel. Id.
Defendant's fourth assignment of error is overruled.
 III.
Defendant's assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this court, directing the County of Lorain Common Pleas Court to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to appellant.
 Exceptions. _________________________________ CLAIR E. DICKINSON, FOR THE COURT
SLABY, P. J., CONCURS
[1] See State v. Fischer (Nov. 4, 1992), Summit App. No. 15557, unreported.
[2] State v. Winstead, supra.